**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: __MARCH 31, 2022__

BERNADETTE BARRETO,        :

       :

                 **Plaintiff,**        :

       :               **1:20-CV-6162-ALC**

          **v.**        :

       :          **OPINION AND ORDER**

**ANDREW SAUL,** *Commissioner of Social Security*,    :

       :

                 **Defendant.**        :

---------------------------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Bernadette Barreto ("Plaintiff" or "Ms. Barreto") brings this action challenging the Commissioner of Social Security's ("Commissioner" or "Defendant") final decision that Ms. Barreto was not entitled to disability insurance benefits under Title II or supplemental security income under Title XVI. Currently pending are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). ECF Nos. 15-16, 21-23. The Court has considered the parties' submissions and for the reasons discussed below, Plaintiff's motion is **DENIED**. Defendant's motion is **GRANTED**.

## I. BACKGROUND

### A. Procedural History

On December 28, 2017, Ms. Bernadette Barreto filed a Title II application for a period of disability and disability insurance benefits. R. at 10. Plaintiff also filed a Title XVI application for supplemental security income (SSI) on the same day. *Id.* In both applications, Plaintiff alleged disability beginning on or about August 9, 2017. *Id.* The Social Security Administration (SSA) denied all of Plaintiff's claims on February 28, 2018, determining that she was not

disabled. *Id*; R. 175. On June 7, 2018, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 180.

Ms. Barreto and her sister, Monica Barreto, testified on June 21, 2019. R. 10, On September 25, 2019, a supplemental hearing was held before ALJ Seth Grossman where Ms. Barreto, represented by counsel Eddy Pierre Pierre, appeared alongside Vocational Expert Josiah Pearson and Medical Experts Steven Goldstein and Dr. Hamrick. R. 48. Ms. Barreto, Mr. Pearson, Dr. Goldstein and Dr. Hamrick offered testimony. R. 48. The ALJ issued a decision denying Plaintiff's claims on November 6, 2019. R. 19. On June 25, 2020, the Appeals Council denied a request for review of the ALJ decision. R. 1. This denial rendered the ALJ's decision the final decision of the Commissioner regarding Plaintiff's claims. *Id.*

On August 6, 2020, Ms. Barreto filed the instant action in federal district court against the Commissioner. ECF No. 1 ("Compl."). On May 25, 2021, Ms. Barreto moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) and submitted an accompanying memorandum of law in support of her motion ("Pl.'s Mot."), ECF Nos. 15-16. On September 24, 2021, Defendant cross-moved for judgment on the pleadings and submitted a memorandum of law in support of its motion and in opposition to Plaintiff's motion ("Def.'s Opp."), ECF Nos. 21-22. On October 10, 2021, Plaintiff submitted a reply memorandum of law in further support of her motion ("Pl.'s Reply"), ECF No. 23. The Court now carefully considers the Parties' fully briefed motions.

**B. Factual Background**

 **1. Non-Medical Evidence**

  *a. June 21, 2019 Hearing before the ALJ*

   i. Testimony from Plaintiff and Monica Barreto

Ms. Barreto appeared before the ALJ without counsel. R. 122. Ms. Barreto's sister, Monica Barreto, also appeared before the ALJ. Though Ms. Barreto was unrepresented, she still decided to proceed with the hearing. R. 124. At the time of the hearing, Plaintiff was 50 years old. R. 127. Plaintiff mentioned that she came to the hearing by train with her sister. R. 131. She completed high school and attended some college at Stenotype Academy in Park Place. R. 127. She suffered a stroke, while at a dentist appointment at Columbia Presbyterian on August 9, 2017, and was later taken to the emergency room. *Id.* R. 128-129. Monica Barreto claimed that hospital staff called her because her sister was suffering from a stroke, that there was a blood clot in her brain, and that she must undergo surgery immediately. R. 130. Along with her issues regarding her stroke, Plaintiff stated that she smokes sometimes, but stopped smoking as much as six cigarettes a day because it gives her headaches. R. 136.

Plaintiff stated that she was hospitalized for seven days following her stroke. R. 131. She attended rehab for her speech difficulties from discharge until the date of the hearing. *Id.* Plaintiff stated that she attended rehab every day for three months for her speech, leg, and arm. R. 131-132. Plaintiff said that she had not returned to work. R. 132.

Plaintiff is unable to walk for long distances without stopping because of pain in her right leg. R. 132. She had an operation on her right leg to remove a blood clot. *Id.* Plaintiff stated that she has no problems with sitting. *Id.* She has difficulty lifting due to issues in her left arm. R. 136. Plaintiff stated that she is right hand dominant, and that she could carry at most two or three pounds. R. 136-137. She could carry a gallon of milk with her right hand which is equivalent to about eight pounds. R. 137.

Plaintiff receives financial and domestic support from her family. She does not cook and clean. R. 133. Plaintiff lives with her 28-year-old son who pays part of the rent while Plaintiff's

public assistance covers the rest. R. 133, 135. Monica Barreto stated that she goes to Plaintiff's house every day to cook and clean for her. R. 133.

Plaintiff was seeing a psychiatrist at Presbyterian Hospital. R. 137. She was seeing her psychiatrist once a month. R.141. Plaintiff explained that she used to attend once a week. R. 141. Plaintiff stated that she could not do a job that would require her to sit down most of the time or to carry anything heavy because she has difficulty focusing. R. 138. Plaintiff asserted that she also could not take a job that would require sitting for most of the time because she suffers from depression and social phobias. R. 133. Plaintiff was taking Duloxetine, a depression medication. R. 139.

Plaintiff occasionally would walk her dog with her sister for about one block. R. 140. She thinks people are staring at her when she walks. R. 140. Monica Barreto clarified that her sister gets embarrassed in front of other people because of her speech problems. R. 140.

### b. *September 25, 2019 Hearing before the ALJ*

#### i. Plaintiff's Testimony

Plaintiff reiterated from her prior testimony that she had completed a year and a half of college at the Stenotype Academy. R. 62. She also reiterated that could take the train with her sister, and that the last time that she had taken the train was for her prior June 21, 2019 hearing. R. 63. Plaintiff stated that her son had driven her to the hearing. R. 63.

Plaintiff was last employed in August 2017 when she worked as a concierge at a hotel for two weeks. R. 62. Plaintiff stated that she stopped working as a concierge because she had a stroke. R. 62. Plaintiff reiterated that she suffered a stroke at New York Presbyterian Hospital while waiting for a dental appointment, that she collapsed, and ended up in the emergency room. R. 62-63.

Plaintiff has problems in her left hand and nerve damage in her right leg. R.64. Plaintiff stated that she cannot sit for long due to an operation on her leg. R.64. Plaintiff described that the pain in her leg feels like "shooting" from her groin to her whole leg towards the lower back. R. 64. Plaintiff explained that she can only walk for a block or two before having to stop and rest, and she can only sit for 24 minutes before getting uncomfortable due to pain in her leg and lower back. R. 64. Plaintiff stated that she can only stand for ten to fifteen minutes due to weakness in her right leg. R. 64-65. Plaintiff wore a brace on her left wrist and a sling on her left arm. R.67. Plaintiff stated that she could not lift anything with her left hand because it would shake due to problems and difficulties stemming from her stroke. R. 68. With respect to her right hand, Plaintiff could brush her teeth, brush her hair, and lift a half gallon of milk. R. 68.

Plaintiff explained that her speech is slow and almost in a singing fashion because after her stroke she could not talk or pronounce words. R.69. Plaintiff attended speech therapy to improve her speech. R. 69. She suffered from depression that caused her to be unfocused and scatterbrained. R. 69. When reading she may be looking at a word but not actually reading it. R. 69-70. When trying to watch television, she flips through channels and cannot focus on one thing. R. 69-70. Plaintiff stated that she does not read as much as she did before the stroke, and she sometimes asks her son to read important documents in the mail to her because she gets confused. R. 70. Along with depression, she faces anxiety that causes her to isolate herself because she is not the same person as before her stroke. R. 71.

Plaintiff did not obtain employment or interview for a job even though she called for interviews because she did not feel ready to start work after the stroke due to her depression. R. 72.

Plaintiff explained that she was still undergoing physical occupational therapy for her left arm and right leg as well as seeing Sandra Alvaro for her depression. R. 72.

ii. Vocational Expert Testimony – Josiah Pearson

When presented with the hypothetical person of Plaintiff's education, work, and occupational background's employability, Mr. Pearson testified that based on Plaintiff's Residual Functional Capacity ("RFC"), she can perform unskilled light occupations available for an individual. R. 10. Mr. Pearson elaborated that the occupation of router or routing clerk is available to Plaintiff. R. 103-104. Moreover, Mr. Pearson explained that Plaintiff could also take a job as a price marker or a photocopy machine operator. R. 104. He affirmed that these jobs were simple task instruction jobs with occasional contact with supervisors, coworkers, and the public, as well as slower in pace. R. 105.

When proposed with a hypothetical that an individual of Plaintiff's education, work, occupational background who is off task for at least one third of the day due to symptoms and impairments employability, Mr. Pearson explained that employers would not tolerate that much time off task so there would be no occupations available to that individual. R. 105-106. Moreover, when proposed with a hypothetical of an individual of Plaintiff's background that took fifteen- to thirty-minute breaks every two hours, Mr. Pearson testified that the individual would not be able to perform the jobs he described. R. 107. When asked if an individual of Plaintiff's background who could only sit and walk for three hours a day could perform the jobs he offered, Mr. Pearson indicated that the individual could not perform the jobs he proposed. R. 107. Mr. Pearson testified that an individual of Plaintiff's background who could only sit or walk for four hours would see a significant erosion (about 50 percent) of jobs he proposed. R. 107-108. Mr. Pearson asserted that one absence a month is tolerable for an employer, but no more. R.

110. Mr. Pearson explained that if Plaintiff could not reach for one-third of the day, she would not be able to perform the jobs he suggested. R. 111. Mr. Pearson also explained that Plaintiff, with her limitations, could perform a simple task job with occasional light lifting, carrying frequently using her right upper extremity and occasionally using the left upper extremity with the left assisting the right for the jobs he suggested. R. 113. He explained, however, that once Plaintiff would have to use the left extremity occasionally and the right frequently, Plaintiff's job options would erode by about fifty to seventy-five percent. R. 113. Considering this, Mr. Pearson suggested that Plaintiff could perform as a housekeeping cleaner and mail sorter. R. 113-114.

### iii. Medical Expert Testimony – Dr. Steven Goldstein

Dr. Goldstein testified that in his opinion the stroke on August 19, 2017 caused Ms. Barreto to suffer from a little bleeding but no other neurologic deficit. R. 74. Dr. Goldstein explained that Ms. Barreto was left with a speech deficit that caused a slow, slurred speech, but her speech can still be understood. *Id.* Dr. Goldstein indicated that Plaintiff was previously a smoker.

Dr. Goldstein explained that he could not find a pulmonary function test in the record to consider Plaintiff's diagnosis of chronic obstructive pulmonary disease. R. 74. Moreover, Dr. Goldstein noted that Plaintiff experienced migraine headaches. R. 74.

Regarding restrictions on Plaintiff's ability to sit, Dr. Goldstein found that Plaintiff did not have any restriction in the ability to sit. R. 74. Dr. Goldstein noted that her lumbar flexion was 60 degrees with 90 being the norm which could contribute to another diagnosis of degenerative disc disease in the lumbar spine thought that was not in her diagnosis. *Id.* Dr. Goldstein explained that the records show that her gait was normal without any restrictions with some deficiency in the grip of her left upper extremity while her strength was described as 4 out

7

of 6 and a flexion of 2 out. R.74-75. Considering these notes, Dr. Goldstein testified that Ms.

Barreto could function at a light level of physical activity. R. 75. Dr. Goldstein explained that

Plaintiff can frequently use, but not continuously use her left upper extremities for fingering. *Id.*

Dr. Goldstein testified that the procedure Plaintiff underwent for her stroke would not

necessarily cause residual pain unless there were complications. R. 81. Dr. Goldstein stated that

he has never performed this type of procedure because it is usually done by an interventional

radiologist. R. 82. Dr. Goldstein asserted that Plaintiff could lift 10 pounds frequently and twenty

pounds occasionally with the right hand without having to lift with the left hand. R. 82-83. Dr.

Goldstein explained that using both hands Plaintiff could lift ten pounds on a frequent basis.

R.83. Dr. Goldstein testified that considering Plaintiff's grip she could lift 10 pounds

occasionally. *Id.* Moreover, he found that Plaintiff can permanently lift five pounds with the left

hand. *Id.*

### iv. Medical Expert Testimony – Dr. Olin Hamrick

Dr. Hamrick testified from a psychiatric point of view. R. 84. Dr. Hamrick opined that

Plaintiff's diagnoses are mild neurocognitive disorder and generalized anxiety disorder. R. 91-

92. Moreover, Dr. Hamrick testified that based on a review of Plaintiff's psychiatric records, he

believed that Plaintiff could perform simple, routine, and repetitive tasks with limitations. R. 96.

These limitations include no more than occasional contact with the public, coworkers, and

supervisors as well as no busy expectations or requirements. R. 96. Dr. Hamrick suggested that

Plaintiff work in a low stress environment not involving any fast-paced or high production quota

activities dealing with tasks rather than people due to her complaints of anxiety and her past

stroke. *Id.*

### c. Function Report

Ms. Barreto's January 2018 function report indicates that she can dress, bathe, care for her hair, shave, and feed herself, except that she needs special help and reminders to comb her hair and take a bath. R. 287-289. Ms. Barreto indicated that she did not need any special help or reminders to take medicine. R. 289. Plaintiff also does limited cleaning due to depression. R. 290. Ms. Barreto does not participate in her usual hobbies and activities such as coloring, reading, and watching TV because she cannot concentrate. R. 291. She cannot lift with her left arm. R. 292. She can only stand for about fifteen mins, walk for a few blocks, sit, climb stairs slowly, and use her right hand more often. *Id.* Moreover, she cannot kneel or squat. *Id*. She struggles with seeing and talking, but has no struggles with hearing. R. 294. She wears glasses and a heart monitor—both of which are prescribed by doctors. *Id.* Lastly, she has problems paying attention and completing tasks. R. 294.

### d. Disability Report

In May 2018, Ms. Barreto reported that her speech and mobility were making progress and reported no new physical or mental conditions with Dr. Eliza Miller. R. 307. She stated that she had past and future appointments with a doctor or health professional for her physical and mental conditions, to include emotional and mental problems. *Id.* Ms. Barreto reported that she was taking the following medications: Aripiprazole, Aspirin, Atorvastatin, Citalopram, and Trazodone. R. 311.

### 2. Medical Evidence

#### a. Yudelka Garcia, FNP-BC

On September 19, 2019, Nurse Practitioner Yudelka Garcia submitted a Disability Questionnaire along with an MRI report. R. 794. In the questionnaire, NP Garcia reported that Ms. Barreto's treatment with her began in August 2017. R. 795. NP Garcia noted that Plaintiff

has been diagnosed with cerebrovascular accident (CVA) aphasia, left upper and lower body weakness, decreased Range of Motion (ROM), and stiffness. R. 795. NP Garcia supported her diagnosis with an MRI from August 11, 2017 which indicated multidoral right hemispheric subarachnoid hemorrhage. R. 795, 801. NP added that Ms. Barreto had been treated by several specialists, including but not limited to specialists in rehabilitation medicine, neurology, cardiology, and behavioral health. R. 796. NP Garcia opined that it was a medical necessity for Plaintiff to avoid continuous sitting for an eight-hour day. R. 797. NP Garcia explained that Plaintiff had left-sided limitations for reaching, handling, and fingering. R. 798. Moreover, NP Garcia opined that Ms. Barreto's symptoms would increase in a competitive work environment, and Ms. Barreto would frequently experience pain that would interfere with her attention and concentration during the eight-hour workday. *Id* Lastly, NP Garcia opined that Plaintiff would take unscheduled breaks to rest at unpredictable intervals. *Id.*

### b. Artur Mushaykov, M.D.

On October 3, 2017, upon review of Plaintiff's medical records and examination of the Plaintiff, Dr. Mushaykov found that, based on a functional capacity outcome assessment, Plaintiff was temporarily unable to work due to her stroke with left arm weakness and dysarthria. R. 463. Moreover, Dr. Muskaykov found in regards to work limitations Plaintiff should avoid: (1) lifting heavy objects up to ten pounds for one to ten times in an hour; (2) prolonged standing up to one hour; (3) prolonged walking up to one hour; (3) pushing heavy objects up to ten pounds one to ten times in an hour; (4) pulling heavy objects up to ten pounds one to ten times in an hour; (5) reaching with the left arm; (6) kneeling; and (7) high stress and (8) dust. R. 457-459. Dr. Mushaykov opined that Plaintiff may need the following work accommodations: (1) limit/eliminate lifting, pushing, pulling, carrying, stooping, bending, and reaching; (2) minimize

walking by placing work site to needed equipment/restrooms; (3) modify workload and/or pacing of work; (4) low stress work environment; and (5) eliminate dust, smoke, odor, and fumes. R. 460.

### c. Donnie Beaubrum, M.D.

On May 30, 2018, Dr. Beaubrum diagnosed Plaintiff with the following: (1) cerebral thrombosis with cerebral infarction; (2) asthma; (3) speech and language deficit; (4) other disorders of cervical region; (5) myalgia and myositis; (6) other specified episodic mood disorder; (7) posttraumatic stress disorder; and (8) unspecified personality disorder. R. 512-514. Moreover, Dr. Beaubrum found the following work limitations: (1) lifting five to ten pounds for less than one hour for one to ten times for hour; (2) standing for less than one hour; (3) walking for less than one hour; (4) pushing five to ten pounds for less than one hour for one to ten times per hour; (5) pulling five to ten less than one hour for one to ten times per hour; (6) sitting for less than two hours continuous; (7) avoid repetitive reaching, kneeling, squatting, postural bending, crouching, stooping, grasping, releasing, handling, heights, and climbing since stroke difficulty mainly with left upper extremity and right lower extremity; (8) limitations with communication due to difficulty with speaking reports when gets overwhelmed her words get slurred and she stutters; (9) memory impairment since stroke; and (10) low stress, labile mood poor adaptation to change. R. 507-509. Moreover, Dr. Beaubrum explained that Plaintiff required work accommodations including limiting/eliminating lifting, pushing, pulling, carrying, stooping, and bending. R. 509.

### d. New York Presbyterian – Dr. Kiran Pandit

On August 9, 2017, Ms. Barreto was examined by Dr. Pandit in the Emergency Department. R. 518.[1] Dr. Pandit noted left facial droop, slurred speech, dysarthria, left upper extremity weakness, and left lower extremity weakness. R. 521-22. Dr. Pandit noted normal strength in the right upper and lower extremities. *Id.* Dr. Pandit diagnosed Plaintiff with a cerebral infarction and admitted her to the hospital. R. 522-23.

e. New York Presbyterian – Dr. Rimmer

On October 8, 2017, Dr. Rimmer conducted a neurological examination. R. 345. Plaintiff complained of left arm weakness, right-sided head numbness, headache, right groin pain, and left sided weakness. R. 349. Upon examination, Dr. Rimmer found that Plaintiff's exam was stable. *Id.* Dr. Rimmer found that the groin pain stemmed from doing squats rather than from her operation (thrombectomy), and that her symptoms are exacerbated by "great stress." *Id.* Dr. Rimmer discharged Plaintiff, but recommended she undergo psychiatric treatment. R. 350.

f. New York Presbyterian – Dr. Miller

On September 28, 2017, Plaintiff saw Dr. Miller for a neurological examination. R. 588. Dr. Miller assessed Plaintiff and found that she had mild left-side weakness and a normal gait. R. 591. Dr. Miller advised Plaintiff to continue her medication, to continue physical therapy, to continue psychotherapy, and to follow up in three months. *Id.*

g. New York Presbyterian – Dr. Michio

On January 19, 2018, Plaintiff saw Dr. Michio for a neurological examination. R. 661. Upon examination, Dr. Michio found that Plaintiff had mild left-side weakness, a normal gait, and episodic lightheadedness. R. 664. Dr. Michio advised Plaintiff to continue her medications,

---

[1] This is the day that Plaintiff suffered a stroke.

continue with cardiac monitoring with the cardiology department, continue physical therapy, continue psychotherapy for depression, and cease smoking. R. 664.

   h. New York Presbyterian – Dr. Matthews

  On February 5, 2019, Plaintiff visited Dr. Matthews for a neurological examination. R. 710. Plaintiff reported to Dr. Matthews at the visit that her pain and numbness had improved and that she was ready to get back to work. R. 711. Dr. Matthews noted that her mild hemisensory loss and hemiparesis was improving. *Id.* Upon examination, Dr. Matthews found that cardiac observations were normal, that her mild hemisensory loss and hemiparesis were resolving, and a new rash had developed which could indicate her predisposition to the stroke. R. 713. Dr. Matthews instructed Plaintiff to continue her medication, see a dermatologist, and undergo smoking counseling. *Id.*

   i. Sandra Alvarado, NP

  On February 18, 2019, Sandra Alvarado, NP saw Plaintiff for situational stressors. R. 806. NP Alvarado diagnosed Plaintiff with depression and generalized anxiety disorder and prescribed Duloxetine. R. 810. NP Alvarado noted that Plaintiff's mood and pain issues were improving on the dose of Duloxetine prescribed, and that Plaintiff had followed up with community resources and was hopeful about future employment. *Id.* On June 3, 2019, NP Alvarado diagnosed Plaintiff with depression and generalized anxiety and continued the prescription for Duloxetine. R. 811, 815. On June 28, 2019, NP Alvarado diagnosed Plaintiff with depression and decreased her Duloxetine dosage from 60mg to 30mg. R. 817, 820-21. On August 23, 2019, NP Alvarado diagnosed Plaintiff with (1) insomnia, (2) depression, and (3) generalized anxiety disorder. R. 825. NP Alvarado continued the Duloxetine 30mg dosage and prescribed Mirtazapine for bedtime. R. 826. On September 4, 2019, NP Alvarado diagnosed

Plaintiff with depression and generalized anxiety disorder and decided to discontinue the Mirtazapine prescription, continue the Duloxetine prescription (60mg), prescribe melatonin, continue psychotherapy, and encourage the use of support groups and community resources. R. 827, 830, 831.

> j. New York Presbyterian – Dr. Boidrini

On November 3, 2018, Dr. Boidrini examined Plaintiff at New York Presbyterian Hospital. R. 632. Dr. Boidrini diagnosed Plaintiff with major depressive disorder including symptoms of decreased sleep, concentration, negative rumination, and guilt. R. 634. Moreover, Dr. Boidrini (1) prescribed citalopram 20mg and trazodone 150mg; (2) continue with Dr. Hoang one time a week with therapy and medicine management; (3) establish social worker contact and pursue public financial assistance; (4) connect connect medical care providers including physical therapy, PCP, and neurologist; (5) follow-up with the doctor. R. 634.

> k. New York Presbyterian – Dr. Renu Maria Culas

On September 7, 2018, Plaintiff saw Dr. Culas for a psychiatric evaluation. R. 707. Dr. Culas noted that Plaintiff had missed several psychiatry appointments. R. 707-08. Dr. Culas diagnosed Plaintiff with major depressive disorder, recurrent episode, and moderate mood-congruent psychotic features. R. 709. She noted that Plaintiff's condition was improving with regard to her level of functioning and depressive symptoms. R. 708.

**C. Opinion Evidence**

> *1. Medical Evidence*

> a. Allen Meisel, M.D.

On February 9, 2018, Plaintiff visited Dr. Meisel for a consultative examination. R. 470. Plaintiff complained of status post cerebrovascular accident with a residual speech defect,

hypercholesterolemia, asthma/COPD, and depression with anxiety. *Id.* Upon examination, Dr.

Meisel diagnosed Plaintiff with: (1) status post subarachnoid bleed with residual slurring of

speech and residual left upper extremity weakness; (2) asthma/chronic obstructive pulmonary

disease; (3) hypercholesterolemia; and (4) depression and anxiety. R. 473. Dr. Meisel opined that

Plaintiff has "moderate limitations of lifting, carrying, and handling objects with the left upper

extremity." *Id.* Moreover, Dr. Meisel observed "moderate limitations of expression," and that

due to her asthma and COPDs she should refrain from exposure to dust and other inhalants. *Id.*

### b. Dr. Samuel Rosenberg

On September 13, 2019, Dr. Rosenberg completed a disability impairment questionnaire

based on his treatment of the Plaintiff from September 25, 2017 to September 12, 2019. R. 783

to 787. Dr. Rosenberg diagnosed Plaintiff with right MCA stroke, expressive aphasia, and

depression with difficulty of speech, fatigue, and depression. R. 783-84. Moreover, Dr.

Rosenberg noted Plaintiff's right left neuropathic pain. R. 784. Dr. Rosenberg opined that

Plaintiff could perform a job in a seated position for four hours a day and in a standing and/or

walking position for three hours a day. R. 785. Dr. Rosenberg opined that it is not a medical

necessity for Plaintiff to avoid continuous sitting in an eight-hour workday and elevating the legs

while sitting. *Id.* Moreover, Dr. Rosenberg opined that Plaintiff had no limitations in reaching,

handling, or fingering. R. 786. Dr. Rosenberg explained that Plaintiff's symptoms would

increase if placed in a competitive work environment because her speech difficulties would

worsen, and she would experience pain for up to one-third of the eight-hour workday. R. 786.

Plaintiff would also have to take unscheduled breaks throughout the workday about every two

hours for fifteen to thirty minutes, and she would be absent from work at least once a month. R.

786-787. Lastly, Dr. Rosenberg opined that emotional factors would contribute to the severity of

Plaintiff's symptoms and functional limitations because she presents symptoms that will worsen with stress. R.787.

### c. Michael Kushner, Ph.D.

On February 9, 2018, Ms. Barreto visited Dr. Kushner for a consultative examination. R. 467. Upon examination Dr. Kushner diagnosed Plaintiff with the following: (1) unspecified depressive disorder, and (2) unspecified cognitive disorder. *Id*. Plaintiff self-identified the following medical diagnosis: (1) left arm pain; (2) cardiac pain; (3) status post stroke; and (4) heart disease. *Id.* Dr. Kushner recommended that Plaintiff continue with psychological/psychiatric treatment. *Id.* Dr. Kushner opined that the expected duration of impairment is about one year, and that Plaintiff's prognosis was fair given her symptoms. Dr. Kushner found that Plaintiff's attention and concentration was impaired, and that her recent and remote memory skills were mildly impaired. R. 466.  Lastly, Dr. Kushner opined that Plaintiff would need assistance managing funds because she had difficulty with simple addition problems. R. 467.

### d. Christopher Flach, Ph.D

On April 9, 2019, Plaintiff visited Dr. Flach for a consultative examination. R. 754. Upon examination, Dr. Flach diagnosed Plaintiff as follows: (1) rule out mild neurocognitive disorder; and (2) unspecified depressive disorder. R. 757. Plaintiff self-reported the following medical diagnosis: (1) left arm pain; (2) cardiac pain; (3) status post stroke; and (4) some heart disease. *Id.* Dr. Flach recommended that Plaintiff continue to follow up with psychiatric services and medical services. *Id.* Dr. Flach opined that Plaintiff could manage funds on her own. *Id.*

## **II. LEGAL STANDARD**

### A. Judicial Review of the Commissioner's Determination

A district court reviews a Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).

The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (internal quotation marks omitted). In other words, this Court must afford the Commissioner's determination considerable deference, and may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted).

**B. Commissioner's Determination of Disability**

A disability, as defined by the Social Security Act, is one that renders a person unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord 42 U.S.C. § 1382c(a)(3)(A). Further, "[t]he impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the

national economy." *Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A)).

The Commissioner uses a five-step process to determine whether a claimant has a disability within the confines of the Social Security Act. 20 C.F.R. § 404.1520(a)(4). First, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). If so, the Commissioner will consider the claimant not to be disabled. *Id*. Second, if the claimant is not engaged in substantial gainful activity, the Commissioner considers whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that meets the duration requirement of a continuous period of 12 months. *Id.* § 404.1520(a)(4)(ii); *see also id.* § 404.1509 (establishing duration requirement). Third, if the claimant suffers from such an impairment, the Commissioner determines whether that impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of the Social Security Act regulations. *Id.* § 404.1520(a)(4)(iii); *see also id.*, Pt. 404, Subpt. P, App'x 1. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's impairment, she has the residual functional capacity ("RFC") to perform her past work. Id. § 404.1520(a)(4)(iv). Finally, if the claimant is unable to perform his past work, the Commissioner determines whether there is other work which the claimant could perform. *Id.* § 404.1520(a)(4)(v).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and 'bears the burden of proving his or her case at steps one through four." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). At step five, however, "the burden shifts to the Commissioner to show that there [are] a significant number of jobs in the national economy that [the claimant] could perform based on his residual functional

capacity, age, education, and prior vocational experience." *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004) (citing 20 C.F.R. § 404.1560), *amended on reh'g*, 416 F.3d 101 (2d Cir. 2005); see also 20 C.F.R. § 404.1520(a)(4)(v).

## C. The ALJ's Decision

First, the ALJ concluded that Plaintiff met the insured status requirements of SSA through December 31, 2020. R at 12.

Second, the ALJ determined that Plaintiff has not engaged in any substantial gainful activity since the onset date of August 9, 2017. *Id.*

Third, the ALJ found that Plaintiff had the following severe impairments: "s/p stroke, mild neurocognitive disorder, depressive disorder, and generalized anxiety disorder." *Id.* Moreover, the ALJ found that Plaintiff has other non-severe medically determined impairments including bronchial asthma, genital herpes, uncontrolled glucose levels, and hypercholesterolemia. R. 13. The ALJ found that Plaintiff complained of episodic lightheadedness with palpitations, but there was no evidence of a cardiac impairment. *Id.* Importantly, the ALJ found that the medically determinable impairments significantly limited Plaintiff's ability to perform work activities as required by SSR 85-28. *Id.*

Fourth, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meet or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

Fifth, the ALJ found that Plaintiff has residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.156(b) and 416.967(b). R. 15. The ALJ found that she was able to lift and carry ten pounds occasionally and five pounds frequently with the left hand. Moreover, the ALJ determined that handling and reaching are limited to frequent with the left

upper extremity, but not continuous. The ALJ explained that Plaintiff can do simple instructions jobs with no high-paced production expectations and no frequent changes in job requirements. *Id.* Moreover, Plaintiff is limited to occasional contact with supervisors, coworkers, and the public. *Id.*

Sixth, the ALJ found that Plaintiff is unable to perform any past relevant work as a hotel manager. R. at 25.

Seventh, the ALJ explained that Plaintiff is forty-eight years old, which was initially "defined as a younger individual age 18-49" on the alleged onset date. R. at 25. But Plaintiff later changed her age category to "closely approaching advanced age." *Id.*

Finally, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform based on her age, education, work experience, and RFC. R. at 26. These jobs include a routing clerk, marker, and photocopy machine operator. *Id.* Therefore, the ALJ decided that Plaintiff was not disabled within the meaning of the Social Security Act. R. at 27.

### III. ANALYSIS

Barreto argues that the ALJ's decision on her RFC was not supported by substantial evidence. More specifically, she contends that the ALJ erroneously evaluated the severity of her asthma, improperly assessed opinion evidence from treating physicians, and failed to account for additional limitations in formulating the RFC. The Court disagrees. Upon review of the record and the ALJ decision, the Court holds that the decision is not erroneous.

**A. The ALJ Did Not Err in Determining that Plaintiff's Asthma is Not Severe**

Ms. Barreto asserts that the ALJ failed to deem her asthma a severe impairment. She further asserts that the error is not harmless because the ALJ failed to account for environmental limitations in formulating the RFC.

Step two of the ALJ's five-step inquiry serves to limit "screen out de minimis claims" for impairments. However, the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe." *Taylor v. Astrue*, 32 F.Supp.3d 253, 265 (N.D.N.Y 2012) (quoting *Coleman v. Shalala*, 895F.Supp. 50, 53 (S.D.N.Y. 1995)). Importantly, if a mere diagnosis of asthma is coupled with evidence showing that the condition is controlled and stabilized with medication, then substantial evidence in the record about the condition can support the ALJ's conclusion that it is a non-severe impairment that does not cause more than a minimal effect on the claimant's ability to work. *Cardoza v. Commissioner of Social Security*, 353 F.Supp.3d 267, 280-81 (S.D.N.Y. Feb. 12, 2019) (concluding that medical treatment notes on asthma reflected that the condition was non-severe and would have a minimal effect on ability to work).

At step two, the ALJ reasoned that the record fails to show a severe bronchial asthma. Treating physician Dr. Meisel noted that Plaintiff should avoid exposure to smoke, dust, and other respiratory inhalants, but Dr. Meisel opines in his medical source statement that Plaintiff *can tolerate continuous* exposure to humidity and wetness, dust, odors, fumes, and pulmonary irritants. R. 750. The only other doctor in the record that referenced Plaintiff's asthma was Dr. Beaubrum. R. 492. However, Dr. Beaubrum noted in her work limitations report that Plaintiff can tolerate dust, fumes, and temperature extremes. R. 509. Plaintiff's asthma was regulated and managed, as shown through her continued prescription for albuterol, an asthma-controlling drug. R. at 743, 764. Therefore, the ALJ properly assessed the severity of Plaintiff's asthma by looking

to other evidence in the record, rather than the minimal evidence supporting the severity of her

asthma. that the record fails to show severe bronchial asthma and that Plaintiff's asthma was

controlled to impose environmental limitations in the RFC determination. Moreover, because the

Court concludes that the ALJ properly evaluated the record in determining that Plaintiff's asthma

is non-severe, it follows that the ALJ did not err in declining to incorporate any asthma-related

environmental limitations into the RFC.

**B. The ALJ Properly Weighed the Medical Evidence in the Record**

Plaintiff argues that the ALJ erred in giving more significant weight to medical opinion

evidence as opposed to statements from treating sources. Specifically, Plaintiff argues that the

ALJ erred when assigning little weight to the opinions of treating sources Dr. Rosenberg, NP

Garcia, Dr. Beaubrum, and Dr. Mushyakov. Ms. Barreto also contends that the ALJ erred in

relying on the opinion of Dr. Goldstein, a non-examining physician that discounted the opinion

of NP Garcia, a treating source. Lastly, Plaintiff asserts that the ALJ erred when assigning

greater weight to the opinion of Dr. Hamrick, a nonexamining medical expert, than NP

Alvarado's opinion.

The Second Circuit has articulated when deference should be given to a treating

physician's opinion. *Thomas v. Comm. of Social Security Admin.*, 479 F.Supp.3d. 66, 80-81

(S.D.N.Y. Aug, 18, 2020). To decide whether an opinion is entitled to controlling weight, the

ALJ must first determine whether the physician's opinion is "'well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the] case record.'" *Id.* (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d

Cir. 2008)). Then, if the ALJ determines that the opinion is not entitled to controlling weight, the

ALJ must decide how much weight to give by explicitly considering the "*Burgess factors*": (1)

the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence

supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence;

and (4) whether the physician is a specialist." *Id.* The ALJ need not "defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from [the claimant's own] medical sources."

20 C.F.R. §§ 404.1520c(a), 416.920c(a); *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019).

The ALJ decided that Dr. Rosenberg's opinion was unpersuasive. R. 23. Stated simply,

under *Burgess*, the opinion was not supported by evidence in the record and was inconsistent

with remaining medical evidence. The ALJ pointed out several discrepancies between Dr.

Rosenberg's findings and other evidence in the record. For example, Dr. Rosenberg stated that

Plaintiff could lift and carry 5-10 pounds occasionally and 0-5 pounds frequently, but the ALJ

determined that Ms. Barreto can lift and carry up to 20 pounds occasionally and 10 pounds

frequently. R. 22. The ALJ also reasoned that Plaintiff does not have restrictions in her capacity

to sit, stand, and walk because her stroke did not influence those functional capacities. Rather,

the ALJ stated, the evidence in the record showed that she had a normal gait, normal lower body

strength, and that "there [was] no substantial objective reason for the limitations stated by Dr.

Rosenberg." R. 22-23.

Moreover, the ALJ also found that NP Garcia's opinion was inconsistent with the rest of

the record. The ALJ found the opinion unpersuasive because "it contrasts with the findings and

improvement documented in the record, with the claimant's mostly normal strength, and with the

opinion of Dr. Goldstein." R. 23. For instance, NP Garcia opined that Plaintiff could not lift or

carry any weight. R. 798. Examining the record, the Court points out that some of Plaintiff's

records from NY Presbyterian noted that Plaintiff's stroke-related symptoms were improving

and/or well-managed. On September 28, 2017, Dr. Miller found that Plaintiff had a stable gait and only mild left sided weakness. R. 591. On January 18, 2019, Dr. Michio noted that Plaintiff exhibited mild left side weakness and a stable gait. R. 664. During some visits, Plaintiff herself reported to her treating physicians that her condition was improving. On February 5, 2019, she told Dr. Matthews that her weakness and numbness improved, that she was walking normally, and that she was even prepared to return to work. R. 711. This evidence clearly contradicts the opinion of harsher limitations stated by NP Garcia (and Dr. Rosenberg). The ALJ added that NP Garcia's views were inconsistent with the opinion of an impartial medical expert (Dr. Goldstein). Having reviewed the entire record, Dr. Goldstein concluded that Plaintiff should be limited to light work with weight limitations for lifting and carrying with the left hand. R. 21. He also explained that Plaintiff could handle and reach frequently but not continuously with the left upper extremity. Dr. Goldstein opined that Plaintiff has normal strength in the right upper extremity, normal gait, but reduced strength in the left upper extremity. Supporting his decision with treatment notes and medical opinions, the ALJ's decision to give little weight to NP Garcia's opinion was not erroneous.

Similarly, the ALJ gave little weight to Dr. Mushyakov's opinion because "it [was] inconsistent with the claimant's improvement, the lack of severe bronchial asthma, and the findings documented by different consulting specialists." R. 21. It is not supported by any clinical or laboratory testing. In addition, Dr. Mushyakov does not identify any significant neurological defects to support his opinion besides speech and face defects and weakness. R. 457. Again, the ALJ supported the decision to give less weight to a treating source with substantial evidence in the record.

The ALJ gave more significant weight to the opinions of impartial medical experts Drs. Goldstein and Hamrick. For example, Dr. Goldstein's opinion was more persuasive because he reviewed the whole record and his findings were consistent with the physical examinations in the record. Dr. Goldstein opined that Plaintiff is limited to light work, except that she can lift and carry ten pounds occasionally and five pounds frequently with the left hand. R. 21. Moreover, Dr. Goldstein explained that Plaintiff could handle and reach frequently but not continuously with the left upper extremity. Dr. Goldstein opined that Plaintiff had normal strength in the right upper extremity, normal gait, but reduced strength in the left upper extremity. These findings are consistent with her medical treatment notes, many from NY Presbyterian visits, as well as observations by Dr. Miller, noting her normal gait and notable strength in her left upper extremity.

Dr. Hamrick explained, based on a review of Plaintiff's psychiatric records, that he believed that she could perform simple, routine, and repetitive tasks with limitations of no more than occasional contact with the public, coworkers, and supervisors as well as no busy expectations or requirements. R. 96. Dr. Hamrick suggested that Plaintiff work in a low-stress environment not involving any fast-paced or high production quota activities dealing with tasks rather than people due to her complaints of anxiety and her history of a stroke. *Id.* Like Dr. Goldstein, Dr. Hamrick proffered an opinion that was consistent with the rest of the record.

The ALJ also properly weigh the opinion of NP Alvarado. Throughout her medical examination reports, NP Alvarado did not note any cognitive, attention, attitude, or intelligence defects to support the medical opinion. *See* R. 808, 813, 819, 824, 829. It is not supported by clinical or laboratory findings. Though this fact is sufficient reason for an ALJ to give less credit to a medical opinion, the Court also notes that psychiatric opinions from Dr. Hamrick and

consulting psychologist Dr. Flach show that Plaintiff could perform simple, routine, and repetitive tasks and that her cognitive functioning was average, and her attention and concentration was only mildly impaired. R. 755-756. NP Alvarado's findings that Plaintiff had "mild to marked" limitations in carrying out tasks and maintaining attention and concentration was inconsistent with the rest of the record. Therefore, the ALJ did not err in giving less weight to NP Alvarado's opinion either.

In sum, the ALJ did not err by affording little weight to certain treating sources. Not only did the ALJ provide sufficient explanation, consistent with *Burgess*, articulating why the treating source opinions were unpersuasive, but it is also apparent from the entire record that those statements do not take into account documented evidence of improvement in Plaintiff's stroke-related symptoms.

**C. The ALJ Did Not Err in Determining Plaintiff's Residual Functional Capacity**

Plaintiff argues that the ALJ failed to consider the RFC portion of Dr. Meisel's findings on limitations in connection with the RFC determination. Moreover, Plaintiff argues that Dr. Meisel's consultative opinion was supported by the vocational expert's testimony that Plaintiff's limitation of occasional use of the left hand for reaching, handling, finger, and other gross and fine manipulation would erode the number of occupations available to a hypothetical individual in Plaintiff's situation. Lastly, Plaintiff argues that the ALJ failed to make a function-by-function assessment of her limitations because he did not identify the evidence to support his RFC finding.

An ALJ grounds his RFC determination on an assessment "of the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). This assessment uses "all the relevant evidence in [the] case record." *Id*. An ALJ is "entitled to weigh all of the evidence

available to make a residual functional capacity finding that was consistent with the record as a whole," and his opinion does not need to "perfectly correspond with any of the opinions of medical sources cited in his decision." *Matta v. Astrue*, 508 Fed.Appx. 53, 56 (2d Cir. 2013) (summary order). The Court must consider all the relevant evidence of an individual's ability to do work-related activities when conducting a function-by function analysis for RFC. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The ALJ must follow a two-step process to determine Plaintiff's RFC. 42 U.S.C § 423(d)(5)(A). First, the ALJ must determine whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged." Id. Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects"of a claimant's pain or symptoms to determine the extent to which they limit a claimant's capacity to work. 20 C.F.R. § 404.1529(b). Whenever a claimant makes statements about the intensity, persistence, and functionally limiting effects of her pain or symptoms that are not substantiated by objective medical evidence, the ALJ "must assess the credibility of the claimant's statements based upon consideration of the case record as a whole." *Burch v. Commr. of Soc. Sec.*, 15-CV-9350, 2017 WL 1184294, at *11 (S.D.N.Y. Mar. 29, 2017).

The Court concludes that the ALJ conducted a sufficiently detailed review of the medical record in this case, which included medical evaluations and treatment notes from about seventeen medical professionals, including treating physicians and medical experts from different hospitals and medical centers; numerous reports and testimony provided by Plaintiff, testimony from her sister and her son; and multiple hearing transcripts (including testimony from impartial medical experts and the VE expert). *See* R. at 15-25. The Court only briefly addresses

the relevant evidence below to the extent it is necessary to conclude that a reasonable factfinder could agree with the ALJ's conclusions.

The RFC determination is "the most [a claimant] can still do despite [her] limitations," and is based upon all the relevant evidence in the case record. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184 (Jul. 2, 1996). Plaintiff bears both the general burden of proving disability within the meaning of the Act and the burden of proof at the first four steps of the sequential analysis. *Burgess*, 537 F.3d at 128. As a result, Plaintiff bears the burden of proving *that her RFC is more restrictive than that found by the ALJ*, whereas the Commissioner need only show that the *ALJ's decision was supported by substantial evidence in the record*. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (emphasis added).

First, Plaintiff contends that the ALJ's RFC determination that she could perform light work is not supported by the evidence. Plaintiff relies exclusively on the opinion from Dr. Meisel. Dr. Meisel opined that Plaintiff could never lift or carry more than twenty pounds, but could continuously lift and carry up to twenty pounds. R. 746. Dr. Meisel opined that Plaintiff could sit, stand, and walk for eight hours in an eight-hour workday. *Id.* Moreover, Dr. Meisel believed that Plaintiff could continuously use the left hand for reaching, and Plaintiff could occasionally use the left hand for handling, fingering, feeling, and pulling. R. 748. Based on these findings, the Court concludes that Dr. Meisel's opinion supports the ALJ's determination that Plaintiff can perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). Here, Dr. Meisel opined that Plaintiff could lift and carry up to 20 pounds as well as sit, stand, and walk for eight hours in an eight-hour workday. This evidence would not satisfy Plaintiff's burden to prove additional restrictions and limitations.

Plaintiff contends that the ALJ failed to conduct a function-by-function analysis in light of her asthma and speech limitations. With respect to asthma, Plaintiff contends that Dr. Meisel's findings that she should avoid exposure to smoke, dust, and other respiratory inhalants would show the need for more environment limitations. Regarding speech, Plaintiff argues that her labored and slurred speech would impact her ability to interact with others, which would support more work-related limitations.

Upon review of the record and the ALJ decision, the Court concludes that the ALJ considered the full record in his determination of Plaintiff's RFC regarding her environmental work-related limitations. As discussed *supra*, the ALJ properly accounted for asthma at step 2. There is substantial evidence to support a finding that her asthma is not severe.

In addition, the Court finds that the ALJ properly considered all the medical evidence in his determination regarding speech limitations. Upon review of the record, the ALJ's determination of her RFC *limited to occasional* contact with supervisors, coworkers, and the public, is consistent with the record and supported by the conclusion by consultative examiners, medical treatment notes, and more. The evidence shows that Plaintiff's speech is fluent and comprehensive despite being slow and slurred. Dr. Kushner observed that Plaintiff's speech intelligibility was fluent and her expressive and receptive language was fluent though she spoke in a slow sing-songy voice. R. 465. Dr. Flach found that Plaintiff's speech was generally fluent, but noted that her speech ranged from high to low and fast to slow with a lisp. R. 755. Other medical examiners, including Dr. Beaubrum and Dr. Rosenberg, reported that Plaintiff had speech defects that would worsen with stress. *See* R. 492, 787. But Plaintiff testified at two ALJ hearings without much difficulty. *See* R. 63,122. And Dr. Goldstein found that the stroke Plaintiff suffered did leave her with a speech deficit, but overall her speech could still be

understood. R. 74. Therefore, the ALJ's RFC determination that includes limitations for occasional contact with supervisors, coworkers, and the public, is not erroneous because it is supported by substantial evidence in the record.

To conclude, the Court holds that the ALJ did not err in its assessment of Plaintiff's restrictions and limitations in formulating her RFC.

### IV. CONCLUSION

For the reasons above, Plaintiff's motion is **DENIED**, and Defendant's motion is **GRANTED**. The Clerk of this Court is respectfully directed to close this case.

**SO ORDERED.**

SO ORDERED:

HON. ANDREW L. CARTER, JR.
UNITED STATES DISTRICT JUDGE

**DATED: 3/31/2022**